UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
PADUCAH DIVISION

CIVIL ACTION NO. 5:12-CV-00125-JHM

PRINCIPAL LIFE INSURANCE COMPANY                    PLAINTIFF

V.

DOCTORS VISION CENTER I, PLLC and                   DEFENDANTS
KENNETH B. GROGAN

and

DOCTORS VISION CENTER I, PLLC                       CROSS-CLAIMANT

V.

KENNETH B. GROGAN                                   CROSS-DEFENDANT

<u>MEMORANDUM OPINION AND ORDER</u>

This matter is before the Court on Principal Life Insurance Company's ("Principal Life")

Motion for Partial Summary Judgment [DN 48], Doctors Vision Center I, PLLC's ("DVC")

Motion for Additional Discovery [DN 56], Principal Life's Second Motion for Partial Summary

Judgment [DN 66], DVC's Second Motion for Additional Discovery [DN 69], and DVC's

Motion to Exclude Expert Witness [DN 70].  Fully briefed, this matter is ripe for decision.  For

the following reasons, Principal Life's Motion for Partial Summary Judgment is **GRANTED**,

DVC's Motion for Additional Discovery is **DENIED**, and the remaining motions are **DENIED**

as moot.  Additionally, DVC's bad faith claims against Principal Life are **DISMISSED** with

prejudice and DVC's crossclaims against Dr. Grogan are **DISMISSED** without prejudice.

## I. BACKGROUND

This case arises from the denial of Defendant Kenneth B. Grogan's ("Dr. Grogan") claim

for disability insurance benefits under a Key Person Replacement Policy ("the Policy") issued by

Plaintiff Principal Life and owned by Defendant DVC.  On December 11, 2009, Dr. Grogan, an owner and employee of DVC, and DVC submitted an application for the subject policy.  (See Application [DN 48-3] 2.)  Under the Policy's terms, Principal Life was to pay benefits to DVC, the owner, if Dr. Grogan, the insured, became disabled.  The Policy was subject to various conditions, exclusions, and definitions, including the Mental/Nervous Exclusion Rider ("the Policy Rider" or "the Rider") at issue here.  The Mental/Nervous Exclusion Rider states:

> This rider is part of the policy and all terms, limitations and exclusions of the policy remain in effect.  This rider is effective on the Effective Date shown above and remains a part of the policy unless removed by Principal Life Insurance Company.
>
> It is agreed that the above numbered policy is amended according to the following limitations:
>
> *We will not pay policy benefits for*:
>
> Any mood or anxiety disorder; or any mental, emotional, adjustment disorder, stress reaction, or post-traumatic stress disorder as defined in the Diagnostic and Statistical Manual of Mental Disorders – Fourth Edition (DSM-IV), or its previous or subsequent editions or replacement, *or any other DSM-IV diagnosis*; or any somatic complaints arising from or attributed to any of the preceding diagnoses, including any treatment therefor, or complication thereof.

(Grogan Policy [DN 48-2] 28 (emphasis added).)  The Rider, as well as the rest of the Policy documents, was signed by Dr. Grogan and DVC on March 25, 2010.  (Id. at 25–29.)

On April 5, 2010, Dr. Grogan was admitted to a rehabilitation facility, Metro Atlanta Recovery Residence ("MARR"), for alcohol and opiates, as well as secondary issues.  (See Apr. 9, 2012 Letter [DN 48-13] 8–9; MARR Diagnosis Report [DN 66-4] 9.)  He was discharged July 3, 2010.  His discharge diagnoses included alcohol dependence and opioid dependence.  (Apr. 9, 2012 Letter [DN 48-13] 9; MARR Diagnosis Report [DN 66-4] 9.)  On September 16, 2011, Dr. Grogan was diagnosed by his physician Dr. Troy Nelson with alcohol dependence and alcohol abuse.  (Apr. 9, 2012 Letter [DN 48-13] 7–8; Dr. Nelson Medical Records [DN 48-6] 1.)

2

Thereafter, two claims were filed for disability benefits to Principal Life on the Policy.  The first on October 24, 2011, signed by "Jerry Grogan POA," stated that Dr. Grogan claimed disability beginning in September 2011 for "Alcohol & Substance Abuse."  (Oct. 24, 2011 Claim [DN 48-7] 1, 4.)  However, the Power of Attorney that accompanied the claim form was not notarized.  (See Grogan Power of Attorney [DN 48-8] 5.)   Thus, on December 7, 2011, Dr. Grogan submitted a second claim form to Principal Life that he had signed, claiming "Total Disability" beginning in April 2010 for "CD – Chemical Dependency."  (Dec. 7, 2011 Claim [DN 48-9] 1.)

Principal Life denied the claim in a March 1, 2012 letter, stating in pertinent part, "Dr. Grogan is not Disabled under the terms of the policy" because "he is claiming Disability for a medical condition that is specifically excluded by the policy."  (Mar. 1, 2012 Letter [DN 48-12] 3.)  In the letter, Principal Life also stated that it had "yet to make a determination regarding the validity of the policy" and that it was "reviewing Dr. Grogan's claim to determine if there were misrepresentations or omissions in the application" that might affect his eligibility for coverage.  (Id. at 1.)

Thereafter, DVC sought an additional explanation for the denial of the claim.  After receiving Dr. Grogan's signed authorization allowing Principal Life to release his medical information, Principal Life sent DVC a letter further explaining the denial.  (Apr. 9, 2012 Letter [DN 48-13].)   In the letter, Principal Life noted a number of specific misrepresentations or omissions in the application for the Policy.  (Id. at 9.)  The letter also reviewed the information Principal Life had received pursuant to its investigation of Dr. Grogan's claim.  Then, noting that the "Mental/Nervous Exclusion Rider" of the Policy stated that Principal Life would not pay policy benefits for "any other DSM-IV diagnosis," Principal Life stated, "All Substance Abuse disorders are listed as DSM-IV diagnoses and can be found on page 191 of the latest edition of

3

this manual: Diagnostic and Statistical Manual of Mental Disorders-Fourth Edition-Text Revision DSM-IV-TR." (Id. at 10.)

In a letter dated June 26, 2012, DVC, through counsel, requested reconsideration of the denial. (June 26, 2012 Letter [DN 48-14] 1.) Initially, Principal Life promised a response within thirty days. It then asked for an extension through August 24, 2012. After receiving the extension, Principal Life affirmed its denial on August 23, 2012, reiterating that Dr. Grogan was not disabled under the terms of the Policy because he claimed disability for a medical condition that was specifically excluded by a rider. (Aug. 23, 2012 Letter [DN 48-15] 4.) Principal Life also advised DVC that it "would not have issued the policy on Grogan if it had known . . . that [he] was disabled and not actively working when he and DVC signed and submitted the Disability Insurance Application Part D . . . on or about March 25, 2010." (Id.) Principal Life stated that DVC's and Dr. Grogan's material and/or fraudulent misrepresentations, omissions, and incorrect statements in the Policy application entitled Principal Life to rescission of the Policy or a declaration that it is void *ab initio*. (Id. at 4–5.)

Principal Life also advised DVC of its decision to file a civil action for the rescission of the subject policy and, alternatively, for a declination of Dr. Grogan's claim for benefits. (Id. at 5.) Principal Life filed this action for a declaratory judgment [DN 1] against DVC and Dr. Grogan the next day, on August 24, 2012. In count I of its Complaint (the "rescission" claim), Principal Life seeks to either rescind the Policy or obtain a declaration that the Policy was void *ab initio* due to fraudulent or material misrepresentations by DVC and Grogan in the Policy application. (Pl.'s Compl. [DN 1] ¶ 25.) In the alternative, in count II of its Complaint (the "coverage" claim), Principal Life seeks a declaration that Dr. Grogan was not disabled under the

4

terms of the Policy because he claimed a disability for a medical condition that was specifically excluded by a Policy rider, and that there is therefore no coverage under the Policy. (Id. ¶ 28.)

On September 18, 2012, DVC filed its Answer to the complaint along with a Counterclaim and Crossclaim [DN 7]. In its Counterclaim against Principal Life, DVC brought a claim for breach of contract based on Principal Life's refusal to pay benefits under the Policy and claims for common law and statutory bad faith. (Def. DVC's Countercl. [DN 7] ¶¶ 17–26.) In its Crossclaim against Dr. Grogan, DVC asserts claims for breach of fiduciary duty, fraud and fraudulent misrepresentation, negligent misrepresentation, and tortious interference with a contractual relationship. (Def. DVC's Crosscl. [DN 7] ¶¶ 5–19.)

On December 11, 2012, DVC moved to dismiss this action on the basis of two McCracken Circuit Court actions that had been filed over three months after this action, neither of which named Principal Life as a party [DN 19].[1] In a Memorandum Opinion and Order dated April 15, 2013, this Court denied DVC's Motion to Dismiss [DN 25].

Principal Life then moved to bifurcate Principal Life's rescission and coverage claims and the corresponding breach of contract counterclaim from DVC's bad faith claims and to stay discovery on the bad faith claims pending the resolution of the rescission and coverage claims [DN 35]. This Court granted the Motion to Bifurcate and the Motion to Stay Discovery by Order dated December 3, 2013 [DN 41].

On March 7, 2014, counsel for DVC sent a letter to counsel for Principal Life requesting a deposition date for Principal Life's corporate representative. (Mar. 7, 2014 Letter [DN 56-2].)

---

[1] On November 30, 2012, Dr. Grogan filed suit in the McCracken Circuit Court against DVC and its other two members. (Compl. [DN 19-2].) That complaint asserted claims relating to DVC's internal affairs. (Id. ¶¶ 34–56.) In its Counterclaim, DVC asserted, among other things, the same four claims it asserted in its Crossclaims in the federal action: breach of fiduciary duty, fraudulent misrepresentation, negligent misrepresentation, and tortious interference with a contractual relationship. (See DVC's Answer & Countercl. [DN 19-3] ¶¶ 1–4, 19–28, 42–46.) Later, on December 11, 2012, DVC filed an action in the McCracken Circuit Court against its insurance agency and agent, which were affiliated with Principal Life. In that complaint, DVC asserted various claims related to their roles in procuring the Principal Life policy. (Compl. [DN 19-4] ¶¶ 24–61.)

Principal Life's counsel responded via letter, on March 12, 2014, noting that he had conveyed DVC's request to Principal Life.  (Mar. 12, 2014 Letter [DN 56-3].)

On March 26, 2014, Principal Life filed a Motion for Partial Summary Judgment (the "Coverage Summary Judgment Motion") [DN 48], seeking summary judgment as to its coverage claim and DVC's counterclaim for breach of contract.  On April 2, 2014, counsel for Principal Life sent a letter to counsel for DVC seeking DVC's agreement to stay discovery pending resolution of that summary judgment motion on the basis that the motion involved pure questions of law (contract interpretation) that could effectively end the case as to Principal Life.  (Apr. 2, 2014 Letter [DN 78-6] 1).  When counsel for DVC had not responded by April 8, 2014, counsel for Principal Life followed up by e-mail, (Apr. 8, 2014 E-mail [DN 78-7]), and then, after receiving no response, filed a Motion to Stay Discovery [DN 50].

On April 15, 2014, the deadline to complete all discovery, DVC requested a 21-day extension of time to respond to the pending motions.  (Apr. 15, 2014 Letter [DN 78-8] 1.) Although DVC indicated that it believed discovery should not be stayed, (id.), it neither requested any extension of the discovery deadline, nor served any notice of deposition.  Principal Life consented to an extension until May 5, 2014 for DVC to respond to the pending motions. On April 30, 2014, the deadline to file any discovery related motions passed without DVC filing any such motions, including no motions seeking an extension of the discovery deadline.  On May 5, 2014, almost three weeks after the discovery deadline, DVC filed a Response to the Coverage Summary Judgment Motion [DN 58], a Motion for Additional Discovery [DN 56], and a Response to the Motion to Stay Discovery [DN 57].

On May 23, 2014, Magistrate Judge King denied Principal Life's Motion to Stay Discovery [DN 64], but did not rule on DVC's Motion for Additional Discovery.

6

On June 13, 2014, Principal Life filed a Second Motion for Partial Summary Judgment (the "Rescission Summary Judgment Motion") [DN 66], seeking summary judgment as to its rescission claim and DVC's counterclaim for breach of contract.  DVC filed a Response to the Rescission Summary Judgment Motion [DN 71][2] on July 25, 2014, as well as a Second Motion for Additional Discovery [DN 69] and a Motion to Exclude Shawn Bailey and Strike Affidavit of Shawn Bailey [DN 70].  Additionally, on August 29, 2014, DVC filed a Notice of Filing [DN 81] the Affidavit of L. Miller Grumley (DVC's counsel) in connection with DVC's Response to the Coverage Summary Judgment Motion [DN 58] and DVC's Motion for Additional Discovery [DN 56].

## II. PRINCIPAL LIFE'S COVERAGE SUMMARY JUDGMENT MOTION

### A.  Summary Judgment Standard

Before the Court may grant a motion for summary judgment, it must find that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  The moving party bears the initial burden of specifying the basis for its motion and identifying that portion of the record that demonstrates the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  Once the moving party satisfies this burden, the non-moving party thereafter must produce specific facts demonstrating a genuine issue of fact for trial.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986).

Although the Court must review the evidence in the light most favorable to the non-moving party, the non-moving party must do more than merely show that there is some "metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio

---

[2] Dr. Grogan adopted DVC's Response in full.  (See Def. Grogan's Resp. to Pl.'s Second Mot. Summ. J. [DN 72] 1.).

Corp., 475 U.S. 574, 586 (1986).  Instead, the Federal Rules of Civil Procedure require the non-moving party to present specific facts showing that a genuine factual issue exists by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence . . . of a genuine dispute."  Fed. R. Civ. P. 56(c)(1).  "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." Anderson, 477 U.S. at 252.

While Kentucky substantive law is applicable to this case pursuant to Erie Railroad v. Tompkins, 304 U.S. 64 (1938), a federal court in a diversity action applies the standards of Federal Rule of Civil Procedure 56, not Kentucky's summary judgment standard as expressed in Steelvest, Inc. v. Scansteel Service Center, Inc., 807 S.W.2d 476 (Ky. 1991).  Gafford v. General Elec. Co., 997 F.2d 150 (6th Cir. 1993) abrogated on other grounds by Hertz Corp. v. Friend, 559 U.S. 77 (2010).

## B.  Discussion

Principal Life seeks summary judgment on count II of its Complaint, in which it seeks a declaration that Defendant Dr. Grogan's claimed disability is not covered under the Policy, as well as count I of DVC's Counterclaim, in which DVC asserts that Principal Life breached its obligation to pay benefits to DVC under the Policy.  Principal Life asserts that Dr. Grogan's claimed disability is based on his diagnosed alcohol and opioid abuse and dependence.  Alcohol and opioid abuse and dependence are DSM-IV diagnoses.  Thus, Dr. Grogan's claimed disability is for DSM-IV diagnoses.  Principal Life further contends that all DSM-IV diagnoses are validly and unambiguously excluded by the Policy Rider.  Therefore, according to Principal Life, the Policy Rider validly and unambiguously excludes Dr. Grogan's claimed disability.  There being

no coverage under the Policy, Principal Life asserts that it did not breach the Policy in refusing to pay the claim.

DVC contends that the proper interpretation of the Policy Rider is that it excludes only those disorders that are listed by individual name. DVC asserts that this renders the Rider ambiguous and, as such, that all ambiguity should be resolved in its favor. Further, DVC argues that the Policy Rider is unenforceable under Kentucky law because it does not meet the clear expression requirement of insurance policy exclusions and because it attempts to incorporate by reference the entire DSM-IV, which it asserts is prohibited under Kentucky law. There being coverage under the Policy, DVC asserts that Principal Life's failure to pay the claim constitutes a breach of the Policy.

Principal Life's Coverage Summary Judgment Motion thus presents two issues that must be resolved: first, whether Dr. Grogan's claimed disability for alcohol and substance abuse and chemical dependency is an "other DSM-IV diagnosis" as that phrase is used in the Policy's Mental/Nervous Exclusion Rider, and, second, whether the Mental/Nervous Exclusion Rider is enforceable under Kentucky law. The Court will address each in turn.

### 1. Dr. Grogan's Claimed Disability Is an Other DSM-IV Diagnosis Under the Unambiguous Plain Meaning of the Policy

The parties do not dispute that Dr. Grogan was diagnosed with alcohol dependence and abuse and opioid dependence, that those diagnoses are DSM-IV diagnoses, that Dr. Grogan claimed disability for "Alcohol & Substance Abuse" and "CD – Chemical Dependency," or that Dr. Grogan's claimed disability for DSM-IV diagnoses. However, the parties disagree as to whether the claimed disability is an "other DSM-IV diagnosis" within the meaning of the Policy. Thus, the resolution of the first issue turns on the interpretation of the terms and language in the Policy.

9

It is well settled that "[t]he construction and interpretation of a contract, including questions regarding ambiguity, are questions of law to be decided by the court." Hazard Coal Corp. v. Knight, 325 S.W.3d 290, 298 (Ky. 2010) (quoting First Commonwealth Bank of Prestonsburg v. West, 55 S.W.3d 829, 835 (Ky. Ct. App. 2000)) (internal quotation marks omitted); see also Caudill Seed & Warehouse Co. v. Houston Cas. Co., 835 F. Supp. 2d 329, 332–33 (W.D. Ky. 2011) (interpretation of insurance policy to determine coverage is legal question). When interpreting an insurance policy, a court must first determine whether the policy is ambiguous, as the resolution of the ambiguity question dictates how the interpretative analysis will proceed. See Frear v. P.T.A. Indus., Inc., 103 S.W.3d 99, 105–06 (Ky. 2003).

If an ambiguity exists, the court may look to extrinsic evidence to determine the intent of the parties. Id. at 106 & n.14. Where an insurance policy is ambiguous, Kentucky law is clear that all questions are to be resolved in favor of the insured, St. Paul Fire & Marine Insurance Co. v. Powell-Walton-Milward, Inc., 870 S.W.2d 223, 227 (Ky. 1994), and exceptions and exclusions are to be strictly construed so as to render the insurance effective, Eyler v. Nationwide Mutual Fire Insurance Co., 824 S.W.2d 855, 859 (Ky. 1992). Under the "reasonable expectations doctrine," an insured is entitled to have an ambiguous policy interpreted so as to provide all the coverage the insured may reasonably expect to have under the policy. Phila. Indem. Ins. Co. v. Morris, 990 S.W.2d 621, 625–26 (Ky. 1999); see also True v. Raines, 99 S.W.3d 439, 443 (Ky. 2003) (footnotes and internal quotation marks omitted) (noting that "[t]he reasonable expectation doctrine is based on the premise that policy language will be construed as laymen would understand it and applies only to policies with ambiguous terms").

However, in the absence of ambiguity, "a written instrument will be enforced strictly according to its terms, and a court will interpret the contract's terms by assigning language its

ordinary meaning and without resort to extrinsic evidence." Hazard Coal Corp., 325 S.W.3d at 298 (quoting Frear, 103 S.W.3d at 106); see also Pierce v. W. Am. Ins. Co., 655 S.W.2d 34, 36 (Ky. Ct. App. 1983) ("Terms in an insurance policy are to be given their plain meanings, and courts should not make a different insurance contract for the parties by enlarging the risk contrary to the natural and obvious meaning of the existing contract."). "If there is no ambiguity, the court's analysis extends only to the four corners of the contract to determine the parties' intention." Journey Acquisition-II, L.P. v. EQT Prod. Co., --- F. Supp. 2d ---, 2014 WL 4104125, at *5 (E.D. Ky. Aug. 18, 2014) (citing Hoheimer v. Hoheimer, 30 S.W.3d 176, 178 (Ky. 2000)); see also Cadleway Props., Inc. v. Bayview Loan Servicing, LLC, 338 S.W.3d 280, 286 (Ky. Ct. App. 2010) ("Even if the contracting parties may have intended a different result, a contract cannot be interpreted contrary to the plain meaning of its terms."). "[W]here there is no ambiguity, the rule of liberal construction in favor of the insured is inapplicable," Kentucky Ass'n of Counties All Lines Fund Trust v. McClendon, 157 S.W.3d 626, 633 (Ky. 2005) (citing Frear, 103 S.W.3d at 106), and "[w]hen the terms of an insurance contract are unambiguous and not unreasonable, they will be enforced," id. at 630 (collecting cases). Thus, the initial question that must be resolved is whether the phrase "any other DSM-IV diagnosis," as used in the Policy Rider, is ambiguous.

An insurance policy or provision therein is ambiguous if its meaning is susceptible to two or more reasonable interpretations. True, 99 S.W.3d at 443. Stated differently, "[a] contract is ambiguous if a reasonable person would find it susceptible to different or inconsistent interpretations." Pedicini v. Life Ins. Co. of Ala., 682 F.3d 522, 526 (6th Cir. 2012) (quoting Cantrell Supply, Inc. v. Liberty Mut. Ins. Co., 94 S.W.3d 381, 385 (Ky. Ct. App. 2002)). An ambiguity may appear either on the face of the policy or when a provision is applied to a

particular claim, Powell-Walton-Milward, 870 S.W.2d at 227, but extrinsic evidence cannot be used to create an ambiguity, Cantrell Supply, 94 S.W.3d at 385.

An insurance policy is not rendered ambiguous simply because the parties disagree as to its construction or urge alternative interpretations. Vencor, Inc. v. Standard Life & Acc. Ins. Co., 317 F.3d 629, 635 (6th Cir. 2003). The Kentucky Supreme Court has made clear that "[t]he mere fact that [a party] attempt[s] to muddy the water and create some question of interpretation does not necessarily create an ambiguity." True, 99 S.W.3d at 443 (alterations in original) (quoting Sutton v. Shelter Mut. Ins. Co., 971 S.W.2d 807, 808 (Ky. Ct. App. 1997)) (internal quotation marks omitted). The Kentucky Court of Appeals likewise has stated, "we are simply unwilling to 'torture words to import ambiguity into a contract where the ordinary meaning leaves no room for ambiguity.'" First Home, LLC v. Crown Commc'ns, Inc., No. 2010–CA–001701–MR, 2012 WL 95560, at *5 (Ky. Ct. App. Jan. 13, 2012) (quoting McCarthy v. Chromium Process Co., 13 A.3d 715, 720 (Conn. App. Ct. 2011)). Thus, "[o]nly actual ambiguities, not fanciful ones, will trigger application of the [reasonable expectation] doctrine." True, 99 S.W.3d at 443. A nonexistent ambiguity will not be utilized to resolve a policy against an insurer; "courts should not rewrite an insurance contract to enlarge the risk to the insurer." Liberty Corpprate Capital Ltd. v. Security Safe Outlet, Inc., 937 F. Supp. 2d 891, 898 (E.D. Ky. 2013) (quoting Powell-Walton-Milward, 870 S.W.2d at 226–27).

The Court finds as a matter of law that the Policy's use of the phrase "any other DSM-IV diagnosis" is unambiguous. See also Locke v. Standard Ins. Co., No. 8:12CV2, 2014 WL 4594202, at *1, *7 (D. Neb. Sept. 12, 2014) (finding that terms of policy and endorsement, which defined mental disorder exclusion as "any diagnosis or condition listed in the most current publication of the [DSM]," were unambiguous). Although DVC presents a thoughtful argument

how the phrase could be construed in a way contrary to the construction urged by Principal Life, the fact that the parties present competing interpretations of the term does not render it ambiguous.  See, e.g., Vencor, 317 F.3d at 635; True, 99 S.W.3d at 443.  The Court finds no ambiguity on the face of the Policy Rider and no ambiguity appears when the provision is applied to Dr. Grogan's particular claim.  As such, neither the reasonable expectations doctrine nor the rule of liberal construction in favor of the insured is applicable here.  See McClendon, 157 S.W.3d at 633.  Furthermore, the unambiguous provision will be "enforced according to the plain meaning of its express terms and without resort to extrinsic evidence."  Cadleway, 338 S.W.3d at 286.

The plain meaning of the Rider's express terms is that all DSM-IV diagnoses—those disorders specifically listed and any other DSM-IV diagnosis—are excluded from coverage.  In essence, the Policy Rider uses the DSM-IV as the yardstick to determine whether a condition is excluded from coverage.  Thus, under the Rider, if a claimed disability is for a diagnosis that is a DSM-IV diagnosis, that claim is not covered under the Policy.  Dr. Grogan claimed disability for alcohol and substance abuse and chemical dependency.  Dr. Grogan's physician, Dr. Troy Nelson, diagnosed Grogan with "alcohol dependence" and "alcohol abuse."  Additionally, Dr. Grogan's rehabilitation facility, MARR, diagnosed Grogan with opioid dependence.  Alcohol abuse and dependence are found on pages 195 to 196 of the DSM-IV; opioid abuse and dependence are found on pages 248 to 249.  See Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 195–96, 248–49 (4th ed. 1994).  Thus, the Court concludes that Dr. Grogan's claimed disability for alcohol and substance abuse and chemical dependency are clearly and expressly "other DSM-IV diagnos[es]" under the plain language of

the Rider.  Therefore, under the plain meaning of the text, Dr. Grogan's claimed disability is not covered under the Policy.

DVC complains that the plain language of the Rider permits it to exclude coverage for disorders "even though they were not specifically listed and were never discussed among the parties or Principal's underwriting documents (which expressly provide that the exclusion rider was included because of Dr. Grogan's history of stress and Xanax prescription)."  (Def. DVC's Resp. to Pl.'s Mot. Summ. J. [DN 58] 15.)  Where, as here, the contract is unambiguous, the text controls and extrinsic evidence such as prior oral discussions and Principal's underwriting documents is irrelevant.  See Journey Acquisition-II, 2014 WL 4104125, at *5 (citing Hoheimer, 30 S.W.3d at 178) ("If there is no ambiguity, the court's analysis extends only to the four corners of the contract to determine the parties' intention."); see also Cadleway, 338 S.W.3d at 286 ("Even if the contracting parties may have intended a different result, a[n unambiguous] contract cannot be interpreted contrary to the plain meaning of its terms.").  Principal Life was free to write a contract that excluded more than merely Dr. Grogan's Xanax prescription.  Dr. Grogan and DVC signed the contract after acknowledging that they understood and agreed to be bound by its terms.  Its terms clearly and expressly state that any DSM-IV diagnosis will be excluded by the Rider.  This Court will "not rewrite [the] insurance contract to enlarge the risk to the insurer."  Medical Protective Co. v. Duma, 478 F. App'x 977, 979 (6th Cir. 2012) (quoting Powell-Walton-Milward, 870 S.W.2d at 226–27).

### 2. Mental/Nervous Exclusion Rider Is Enforceable Under Kentucky Law

The second issue that must be resolved is whether the Mental/Nervous Exclusion Rider is enforceable under Kentucky law.  DVC contends the Rider is unenforceable on three separate grounds, which the Court will address in turn.

14

### *i. Clear Expression Requirement of Insurance Policy Exclusions*

DVC contends that the plain meaning of the Rider is unenforceable because it does not meet the clear expression requirement of Kentucky law.  Under Kentucky law, "[a]ny limitation on coverage or an exclusion in a policy must be clearly stated in order to apprise the insured of such limitations.  Stated otherwise, not only is the exclusion to be carefully expressed, but, as in this case, the operative terms clearly defined."   <u>Powell-Walton-Milward</u>, 870 S.W.2d at 227.  DVC argues that the phrase "any other DSM-IV diagnosis" does not specifically identify which "other" DSM-IV diagnoses are excluded.  Thus, according to DVC, the Rider does not exclude coverage for alcohol and substance abuse and chemical dependency because those disorders were not specifically listed by individual name so as to apprise DVC of their exclusion.  The Court finds this argument unavailing.

The operative terms of the Mental/Nervous Exclusion Rider are clearly defined: the disorders that are excluded from coverage are any and all DSM-IV diagnoses.  DVC cites to no authority that prohibits an insurance policy from containing broad exclusions.  It has long been recognized that exclusions can be "broad" so long as they are "sufficiently clear."  <u>See</u> <u>Penn. Cas. Co. v. Elkins</u>, 70 F. Supp. 155, 159 (E.D. Ky. 1947); <u>see also</u> <u>Mansoob v. Liberty Mut.</u>, No. 09-13191, 2010 WL 4867409, at *1, *7 (E.D. Mich. Nov. 23, 2010) (finding that provisions of LTD benefit plan, which defined mental illness exclusion as any psychiatric or psychological condition classified in DSM,  were "clearly stated").  In <u>Elkins</u>, the insurance policy expressly excluded from its coverage "bodily injury to or death of *any* employee of the insured while engaged in the employment, other than domestic, of the insured."  70 F. Supp. at 156 (emphasis added).  The court explained that

> The adjective "any," in effect, is equivalent to every.  It serves to enlarge the scope of the phrase "any employee," as used in the exclusion clause of the policy,

so as to clearly negative the idea that it was used in a restrictive sense.  It precludes limiting the application of the phrase to a particular kind of employee.  All ambiguity as to the breadth of the meaning of exclusion clause is removed by this characterizing adjective extending its application to every employee of the insured while engaged in employment . . . .  That such is the significance of "any," as ordinarily used and popularly understood, is attested by all standard dictionaries.  There is no need for resort to technical rules of construction.  The rule that an ambiguity in an insurance policy will be given the interpretation most favorable to the insured, has no application where the terms are clear and unambiguous.

Id. at 158.  The court concluded that "[t]he words used make the broad indiscriminate exclusion sufficiently clear."  Id. at 159.  This Court likewise concludes that the language of the Mental/Nervous Exclusion Rider makes the broad exclusion sufficiently clear.  Thus, the Court finds that the plain, clear, and unambiguous language of the Rider put DVC on notice that any disability that is a DSM-IV diagnosis is excluded from coverage.[3]

### ii. Incorporation by Reference

Having found that the Rider unambiguously and clearly excludes from coverage all DSM-IV diagnoses, the Court must now determine whether Dr. Grogan's claimed disability for a DSM-IV diagnosis is nonetheless covered because Principal Life did not attach the DSM-IV to the Policy or provide it to DVC and Dr. Grogan prior to execution of the Policy.

DVC contends that the exclusion is unenforceable because it attempts to incorporate by reference extrinsic materials (the DSM-IV) that were not attached to the policy or provided to DVC and Dr. Grogan.[4]  DVC relies on Twin City Fire Ins. Co. v. Terry, 472 S.W.2d 248 (Ky. 1971), and proposes that it broadly prohibits incorporation by reference in insurance contracts.  (Def. DVC's Resp. to Pl.'s Mot. Summ. J. [DN 58] 9 ("The practice of incorporating extrinsic materials into an insurance policy is expressly prohibited by KRS 304.14-180 and was

---

[3] DVC additionally argues that Rider language not at issue here renders the provision not sufficiently clear.  As the relevant language here is "any other DSM-IV diagnosis," the Court declines to address this argument.
[4] Principal Life admits that it did not provide the DSM-IV to either Dr. Grogan or DVC.  (Pl.'s Resps. to Def. DVC's Req. Admis. [DN 58-1] ¶ 1.)

disavowed by the Kentucky Court of Appeals in <u>Twin City Fire</u>.").)  DVC argues that just as in

<u>Twin City</u>, "Principal [Life] cannot avoid coverage by mere reference to 'any other DSM-IV

diagnosis.'"  (<u>Id.</u> at 11.)

Upon examination of the authorities cited and upon its own research, the Court finds that

DVC's interpretation of Kentucky law is without support and that Kentucky law recognizes the

doctrine of incorporation by reference as it applies to insurance contracts.  <u>See, e.g.</u>, <u>Bachelor</u>

<u>Land Holdings, LLC v. Chubb Customs Ins. Co.</u>, No. 3:11-CV-00152, 2011 WL 5389197, at *7

(W.D. Ky. Nov. 4, 2011) (citing <u>Twin City</u>, 472 S.W.2d 248); <u>see also</u> <u>Brown v. Ind. Ins. Co.</u>,

184 S.W.3d 528, 542 (Ky. 2005) (Wintersheimer, J., dissenting) (citing <u>Twin City</u>, 472 S.W.2d

248) (explaining that Kentucky courts require "an insurance policy expressly and clearly

incorporate any extrinsic document, statutory or otherwise").  Kentucky law requires that all

terms of an insurance contract be "plainly expressed" in the policy itself.  <u>See</u> KRS 304.14-

180(2) ("No insurer or its representative shall make any insurance contract or agreement relative

thereto other than as is plainly expressed in the policy."); <u>see also</u> <u>Twin City</u>, 472 S.W.2d at 250.

Kentucky's highest court explained that the legislative purpose behind that requirement was that

the insured "might know from his policy what his contract was, and that contracts not contained

in the policy, or written upon the back of it or attached to it, should not be considered."

<u>Provident Sav. Life Assurance Soc'y v. Puryear's Adm'r</u>, 59 S.W. 15, 16 (Ky. 1900).  To that

end, Kentucky law permits insurance contracts to incorporate by reference extrinsic material

only where that reference is clear, so as "to indicate that the parties intended to make [the

extrinsic material] part of [the] contract."  <u>Twin City</u>, 472 S.W.2d at 249.

The factual background in <u>Twin City</u> reveals the distinctions between defining the scope

of an exclusion by reference to an authoritative medical reference text and attempting to

incorporate by reference ancillary documents that are unavailable to the public and contain additional contractual terms. In Twin City, under the guise of the incorporation by reference doctrine, the insurance company attempted to bind the insured to a printed form that was accidentally omitted from the policy given to the insured, which contained a term of the insurance contract requiring suit to be filed within twelve months from the date of loss. Twin City, 472 S.W.2d at 248. Significantly, there was no "clear reference" in the policy to the contents of the omitted form and nothing to put the insured on notice or inquiry as to its contents. Id. at 249–50. Under the circumstances, the court rejected the insurance company's attempt to incorporate the omitted form by reference. Id. at 250.

In the present case, by contrast, the Policy Rider expressly and clearly references the DSM-IV and its contents such as would put DVC on notice or inquiry,[5] unlike the "mere reference" to the omitted form the court found insufficient in Twin City. Moreover, the court in Twin City was concerned that the insurer was attempting to enforce a provision that was never provided to the insured. Here, there is no dispute that DVC and Dr. Grogan received the Rider excluding the DSM-IV diagnoses from coverage.[6]

The case here is analogous to Auto Club Property-Casualty Insurance Co. v. B.T. ex rel. Thomas, 997 F. Supp. 2d 702 (W.D. Ky. 2014), where this Court used Kentucky's penal statutes to interpret whether an exclusion for injury or damage resulting from a "criminal act" was applicable. The DSM-IV, like the penal statutes, provides the definitions by which to apply the terms of the exclusion. Further, unlike the omitted ancillary form in Twin City, and like the

---

[5] DVC's argument that the Rider did not clearly indicate which diagnoses were excluded from coverage by the Rider is again unavailing. The Rider's use of "any other" clearly indicated which diagnoses were to be included—all diagnoses not previously listed.
[6] Not only did DVC and Dr. Grogan receive the Rider, they both acknowledged through their signatures that they understood and agreed to the terms of the Rider.

penal statutes in <u>B.T. ex rel Thomas</u>, the DSM-IV is published and readily available to the public.

Thus, the Court rejects DVC's contention that the Rider is unenforceable merely because it defines its scope broadly by clear reference to all DSM-IV diagnoses. Such a decision is consistent with the well-reasoned authorities from other jurisdictions that have considered similar questions. <u>See</u> <u>Simonia v. Glendale Nissan/Infinity Disability Plan</u>, 378 F. App'x 725, 727 (9th Cir. 2010) (finding that "mental disorder" defined by DSM under plan was unambiguous, clear, and exclusion enforceable); <u>Lee v. Kaiser Found. Health Plan Long Term Disability Plan</u>, 812 F. Supp. 2d 1027, 1040 (N.D. Cal. 2011) (finding that plan provided "precise definition" of what was excluded under mental disease exclusion: any "condition sufficient to meet the diagnostic criteria in the DSM").

### iii. Double Incorporation by Reference

DVC also argues that the Policy's exclusion of DSM-IV diagnoses is a "double incorporation by reference," that is invalid pursuant to <u>Emery Worldwide, a Subsidiary of CNF, Inc. v. AAF-McQuay, Inc.</u>, No. 2003-CA-001446-MR, 2005 WL 2402544 (Ky. Ct. App. Sept. 30, 2005). In <u>Emery Worldwide</u>, an unpublished, non-insurance case, the Kentucky Court of Appeals adopted the position of the Jefferson Circuit Court, which stated it found "no precedent in Kentucky for an extension of the doctrine of incorporation by reference to encompass a situation involving a double incorporation." <u>Id.</u> at *4. The Court finds that the Policy Rider at issue in this case does not pose the sort of "double incorporation" that the courts addressed in <u>Emery Worldwide</u>.

In <u>Emery Worldwide</u>, the language on the front of a waybill (the parties' contract) incorporated the terms on the reverse side, which themselves incorporated a 20-page service guide. <u>Id.</u> at *2. Only the front of the waybill, and not the reverse side, was signed. <u>Id.</u> In

finding that this was a double incorporation that had no precedent in Kentucky law, the Kentucky Court of Appeals relied on the requirement in KRS 446.060 that a writing signed by a party must be signed "at the end or close of the writing."  Id. at *3 (quoting circuit court opinion).  The court stated:

> [w]when [sic] the signature is in the middle of a writing, it gives no assurance that the contracting parties intend to be bound by matters which do not appear above their signatures; however, when a signature is placed after clear language [that] has expressed the incorporation of other terms and conditions by reference, it is a logical inference that the signer agrees to be bound by everything incorporated.

Id. at *3 (alteration in original) (quoting circuit court opinion).

In contrast to the situation in Emery Worldwide, both Dr. Grogan and DVC signed the Mental/Nervous Exclusion Rider issue at its bottom, underneath all of the operative language. (See Grogan Policy [DN 48-2] 28.)  Thus, this is not the sort of "double incorporation" of terms not appearing above the signature that troubled the Kentucky Court of Appeals in Emery Worldwide.  Additionally, the Court rejects DVC's argument regarding double incorporation by reference because the Rider was a part of the Policy itself, unlike the reverse side of the waybill at issue in Emery Worldwide.

For the above reasons, the Court concludes, as a matter of law, that Dr. Grogan's claimed disability is excluded by the Policy Rider and therefore that Principal Life is entitled to summary judgment on its coverage claim.  Because no coverage existed under the Policy, the Court concludes as a matter of law that Principal Life did not breach the Policy in refusing to pay the claim.  Thus, the Court also concludes that Principal Life is entitled to summary judgment on DVC's breach of contract counterclaim.  Accordingly, the Court **GRANTS** Principal Life's Coverage Summary Judgment Motion [DN 48].

Because Principal Life sought a declaration as to the coverage claim as an alternative to its rescission claim, and because the Court is granting Principal Life's Coverage Summary

Judgment Motion, the Court now **DENIES** Principal Life's Rescission Summary Judgment Motion [DN 66] as moot.  The Court also **DENIES** as moot DVC's corresponding motions—its Second Motion for Additional Discovery [DN 69] and Motion to Exclude Shawn Bailey and to Strike the Affidavit of Shawn Bailey [DN 70].

### III. DVC'S MOTION FOR ADDITIONAL DISCOVERY

Having concluded that the Rider is unambiguous and construing it according to the plain meaning of its terms, the Court addresses DVC's Motion for Additional Discovery [DN 56]. Defendant DVC seeks additional discovery under Rule 56(d) regarding alleged ambiguity issues prior to consideration and disposition of Principal Life's Coverage Summary Judgment Motion. The Court concludes that DVC failed to show that need for discovery precluded grant of partial summary judgment for Principal Life on its coverage declaratory action, where issues for which discovery was sought were not relevant to resolution of Principal Life's claim.

### A.  Rule 56(d) Standard

After a party files for summary judgment, "the party opposing the motion may, by affidavit, explain why he is unable to present facts essential to justify the party's opposition to the motion." Summers v. Leis, 368 F.3d 881, 887 (6th Cir. 2004) (citing Fed. R. Civ. P. 56(f)[7]). "The burden is on the party seeking additional discovery to demonstrate why such discovery is necessary."  Id. at 887 (citing Wallin v. Norman, 317 F.3d 558, 564 (6th Cir. 2003)).  "Bare allegations or vague assertions of the need for discovery are not enough."  Id. at 887.  "In order to fulfill the requirements of Fed. R. Civ. P. 56[(d)], [DVC] must state with 'some precision the materials [it] hopes to obtain with further discovery, and exactly how [it] expects those materials would help [it] in opposing summary judgment.'"  Id. (quoting Simmons Oil Corp. v. Tesoro

---

[7] The provisions of subdivision (d) appeared in subdivision (f) prior to the December 1, 2010 amendment of Rule 56.  Fed. R. Civ. P. 56 advisory committee note.

Petroleum Corp., 86 F.3d 1138, 1144 (Fed. Cir. 1996)); Sharkey v. FDA, 250 F. App'x 284, 291

(11th Cir. 2007) (internal quotation marks omitted) ("A Rule 56[(d)] motion must be supported

by an affidavit which sets forth with particularity the facts the moving party expects to discover

and how those facts would create a genuine issue of material fact precluding summary

judgment.").  Rule 56(d) provides:

> If a nonmovant shows by affidavit or declaration that, for specified reasons, it
> cannot present facts essential to justify its opposition, the court may:
>     (1) defer considering the motion or deny it;
>     (2) allow time to obtain affidavits or declarations or to take discovery; or
>     (3) issue any other appropriate order.

Fed. R. Civ. P. 56(d).

## B.  Discussion

DVC filed its Motion for Additional Discovery [DN 56] on May 5, 2014, three weeks

after the deadline to complete discovery and a week after the deadline to file all discovery related

motions.  DVC did not file an affidavit to support its motion at that time or in its reply brief.  As

such, Principal Life states that DVC has failed to meet the threshold standard for continued

discovery.  Principal Life contends that because DVC failed to file a Rule 56(d) affidavit or

declaration to demonstrate a specific need to continue discovery for Principal Life's coverage

claim, DVC's request for further discovery must be denied.  Ford v. Pizza Hut of Se. Kan., Inc.,

No. 4:13-CV-00015, 2013 WL 4500090, at *2 (W.D. Ky. Aug. 20, 2013) (quoting Cacevic v.

City of Hazel Park, 226 F.3d 483, 488 (6th Cir. 2000)) (internal quotation marks omitted) ("The

importance of complying with Rule 56(f) cannot be overemphasized.").

However, on August 29, 2014, over three months after filing its Motion for Additional

Discovery [DN 56], DVC submitted the affidavit of its counsel [DN 81-1], which ostensibly

states why further discovery is needed.  The affidavit states that it incorporates the reasons

specified in DVC's Memorandum in Support of its Motion for Additional Discovery [DN 56]

and Reply in Support of Motion for Additional Discovery [DN 63] as support for its conclusory allegation that "DVC cannot present facts essential to its opposition to Principal's Motion for Partial Summary Judgment [DN 48]."  (Grumley Aff. [DN 81-1] ¶ 4.)

According to its briefs, DVC seeks additional discovery regarding the issue of the proper interpretation of the Rider.  DVC alleges the exclusion is unenforceable because, among other reasons, it contains both patent and latent ambiguities.  Asserting that latent ambiguities require reference to extrinsic materials to detect and resolve, DVC contends that it "is entitled to a full opportunity to conduct needed and necessary discovery on the ambiguities inherent in the rider" and that "[i]n order to establish and explore these ambiguities, [it] has requested and will propound additional discovery requests."  (Def. DVC's Mot. Additional Disc. [DN 56-1] 4.) DVC seeks the additional discovery

> to discover how Principal has applied and interpreted the Mental/Nervous Rider in other circumstances, the specifics of Principal's underwriting process, the information Principal considered when issuing this specific policy, and Principal's own procedures and guidelines for interpreting its policies.

(Id. at 5.)

Even overlooking any procedural issue with DVC's original failure to file an affidavit or declaration pursuant to Rule 56(d), the Court finds that DVC has not met the standard required under the Rule for further discovery.  DVC does state what facts it hopes to obtain and purports to state with particularity how those facts will help it in opposing summary judgment.  However, DVC's request and alleged need for further discovery rest on the false premise that the Rider is ambiguous.

Essentially, DVC seeks additional discovery on two issues: to establish the existence of an ambiguity in the Rider and to discern the scope of the allegedly ambiguous Rider.  While extrinsic evidence would be relevant to discerning the scope of an ambiguous provision, extrinsic

evidence cannot be used to *create* an ambiguity.[8] <u>Cantrell Supply</u>, 94 S.W.3d at 385. Thus, additional discovery could not assist DVC regarding the issue of whether the Rider is ambiguous. The Court having found as a matter of law that the Rider is unambiguous, only the text of the insurance policy is relevant to the issue of interpretation. Thus, additional discovery also could not assist DVC regarding the interpretation issue. As the issues for which discovery is sought are not relevant to the resolution of Principal Life's Coverage Summary Judgment Motion, the Court therefore **DENIES** Defendant DVC's Motion for Additional Discovery [DN 56].

### IV. DVC'S STATE LAW CLAIMS

Having concluded that Dr. Grogan's claim is not covered under the Policy, the Court must now determine what to do with the remaining state law claims—DVC's bad faith counterclaims against Principal Life and DVC's various crossclaims against Dr. Grogan. Because an essential element of any bad faith claim is that the insurer is obligated to pay the claim under the terms of the policy, <u>Wittmer v. Jones</u>, 864 S.W.2d 885, 890 (Ky. 1993), and because the Court has concluded that Principal Life was not obligated to pay as no coverage existed for the claimed disability, the Court **DISMISSES** with prejudice DVC's bad faith counterclaims.

Further, the Court finds that it will decline to exercise supplemental jurisdiction over— and dismiss without prejudice—DVC's state-law crossclaims against Dr. Grogan. Section 1367(c) of Title 28 of the United States Code permits a district court to decline to exercise

---

[8] The assertion by DVC that the Rider contains a latent ambiguity does not circumvent this rule that extrinsic evidence cannot be used to create an ambiguity. As mentioned, "[a]n ambiguity may either appear on the face of the policy or . . . when a provision is applied to a particular claim." <u>St. Paul Fire & Marine Ins. Co. v. Powell-Walton-Milward, Inc.</u>, 870 S.W.2d 223, 227 (Ky. 1994). The Court found that there is no ambiguity on the face of the Rider or as applied to Dr. Grogan's claim, thus no amount of further factual discovery could affect the resolution of this question of law.

supplemental jurisdiction over a claim if it raises a novel or complex issue of state law; it substantially predominates over the claims over which the court had original jurisdiction; the court has dismissed all claims over which it had original jurisdiction; or in exceptional circumstances in which there are other compelling reasons to decline jurisdiction.  28 U.S.C. § 1367(c); see also United Mine Workers v. Gibbs, 383 U.S. 715, 726 (1966).  In Carnegie-Mellon University v. Cohill, 484 U.S. 343 (1988), the Supreme Court discussed the propriety of exercising supplemental jurisdiction over pendent state-law claims following its decision in United Mine Workers v. Gibbs, 383 U.S. 715 (1966).

> The Gibbs Court recognized that a federal court's determination of state-law claims could conflict with the principle of comity to the States and with the promotion of justice between the litigating parties.  For this reason, Gibbs emphasized that "pendent jurisdiction is a doctrine of discretion, not of plaintiff's right."  [Id.]  Under Gibbs, a federal court should consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity in order to decide whether to exercise jurisdiction over a case brought in that court involving pendent state-law claims.  When the balance of these factors indicates that a case properly belongs in state court, as when the federal-law claims have dropped out of the lawsuit in its early stages and only state-law claims remain, the federal court should decline the exercise of jurisdiction by dismissing the case without prejudice.  [Gibbs, at 726–27.]

Carnegie-Mellon, 484 U.S. at 349–50 (footnote omitted).

Given that the Court has disposed of all the claims over which it had original jurisdiction, the remaining claims are state-law claims, and there is a pending state suit filed in McCracken Circuit Court, the Court finds that the balance of judicial economy, convenience, fairness, and comity all point toward declining supplemental jurisdiction.  Therefore, the Court declines to exercise supplemental jurisdiction over DVC's state-law crossclaims.  Accordingly, the Court **DISMISSES** without prejudice DVC's state-law crossclaims against Dr. Grogan.

## V. CONCLUSION

For the reasons set forth above, **IT IS HEREBY ORDERED** that Principal Life's Motion for Partial Summary Judgment [DN 48] is **GRANTED** and DVC's Motion for Additional Discovery [DN 56] is **DENIED**.

**IT IS FURTHER ORDERED** that Principal Life's Second Motion for Partial Summary Judgment [DN 66], DVC's Second Motion for Additional Discovery [DN 69], and DVC's Motion to Exclude Expert Witness [DN 70] are **DENIED** as moot. DVC's bad faith claims against Principal Life are **DISMISSED** with prejudice and DVC's crossclaims against Dr. Grogan are **DISMISSED** without prejudice.

**Joseph H. McKinley, Jr., Chief Judge**
**United States District Court**

December 1, 2014

cc: counsel of record

26